WHITE ET AL., APPELLANTS, v. WYETH LABORATORIES, INC., APPELLEE.

[Cite as White v. Wyeth Laboratories, Inc. (1988), 40 Ohio St. 3d 390.]

(No. 87-1657—Submitted November 14, 1988—Decided December 30, 1988.)

*Kabat, Mielziner & Sobel, Gary Kabat, Jonathan Sobel, Bredhoff & Kaiser, Michael H. Gottesman, Deborah C. Malamud, Stewart Jaffy & Associates Co., L.P.A., Stewart Jaffy, McDowell & Colantoni, Anthony C. Colantoni* and *Boyd McDowell,* for appellants.

*Wildman, Harrold, Allen & Dixon, Richard C. Bartelt, Peter A. Tomaras, Baker & Hostetler, Albert J. Knopp, Mary M. Bittence, Hedy M. Powell, Reed, Smith, Shaw & McClay* and *Michael T. Scott,* for appellee.

*Pierson, Ball & Dowd, Stephan E. Lawton* and *Leslie A. W. Purdy,* urging affirmance for *amicus curiae,* American Academy of Pediatrics.

LOCHER, J.

I

We first consider appellants' contention that federal law does not preempt state law concerning the liability of vaccine manufacturers for deaths or injuries caused by their products.

Under the Supremacy Clause of the United States Constitution, state laws that interfere with or are contrary to federal laws on a given subject are a nullity. *E.g., Gibbons* v. *Ogden* (1824), 22 U.S. (9 Wheat.) 1, 210-211. Although this court would not ordinarily reach this constitutional question unless there were a need to do so, we find this question has been well-settled. Congress itself has clearly expressed its intention not to preempt liability claims against vaccine manufacturers under state law, by stating in the National Childhood Vaccine Injury Act that "* * * State law shall apply to a civil action brought for damages for a vaccine-related injury or death." Section 300aa-22(a), Title 42, U.S. Code. Furthermore, all federal courts that have addressed the issue have concluded that there is no federal preemption of state tort or contract remedies against vaccine manufacturers. See, *e.g., Abbot* v. *American Cyanamid Co.* (C.A. 4, 1988), 844 F. 2d 1108, 1113-1114, certiorari denied (1988), 488 U.S. ___, 102 L. Ed. 2d 248, 109 S. Ct. 260.[3] Accordingly, Wyeth's liability for Tyler's injuries may be determined under Ohio law.

---

[3] See, also, *Hurley* v. *Lederle Laboratories* (C.A. 5, 1988), 851 F. 2d 1536; *Knudson* v. *United States* (M.D. Fla. 1987), 691 F. Supp. 1346; *Foyle* v. *Lederle Laboratories* (E.D. N.C. 1987), 674 F. Supp. 530; *Martinkovic* v. *Wyeth Laboratories* (N.D. Ill. 1987), 669 F. Supp. 212; *Morris* v. *Parke, Davis & Co.* (C.D. Cal. 1987), 667 F. Supp. 1332; *MacGillivray* v. *Lederle Laboratories* (D. N.M. 1987), 667 F. Supp. 743; *Graham* v. *Wyeth Laboratories* (D. Kan. 1987), 666 F. Supp. 1483; *Wack* v. *Lederle Laboratories* (N.D. Ohio 1987), 666 F. Supp. 123; *Patten* v. *Lederle Laboratories* (D. Utah 1987), 655 F. Supp. 745.

In *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 4 O.O. 3d 466, 364 N.E. 2d 267, this court approved and adopted Section 402A of 2 Restatement of the Law 2d, Torts (1965) 347-348, as the law of Ohio with respect to strict products liability. That section provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

In *Seley* v. *G.D. Searle & Co.* (1981), 67 Ohio St. 2d 192, 21 O.O. 3d 121, 423 N.E. 2d 831, this court also recognized that Comment *k* to Section 402A provides the following exception to the strict liability of manufacturers for injuries caused by defective products:

"*Unavoidably unsafe products.* There are some products, which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidably high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." (Emphasis *sic.*) 2 Restatement of the Law 2d, Torts, *supra,* at 353-354.

Thus, under Comment *k*, a manufacturer of an unavoidably unsafe product may not be held strictly liable for injuries caused thereby, provided that the product was "* * * properly prepared, and accompanied by proper directions and warning * * *."[4] *Id.* We now turn to a consideration of the ap-

---

[4] Comment *k* does not, however, provide the manufacturer of such a product with a defense against a claim of negligence. See *Toner* v. *Lederle Laboratories*

plicability of Comment *k* in the case *sub judice.*

## II

Appellants next contend that Comment *k* does not apply as a matter of law to *all* prescription drugs and vaccines. The language of the comment is somewhat unclear on this point, but the following reasoning by the Supreme Court of Idaho in *Toner* v. *Lederle Laboratories* (1987), 112 Idaho 328, 339, 732 P. 2d 297, 308, is persuasive:

"The comment refers to 'some' products which are unavoidably unsafe; the comment states such products are 'especially *common* in the field of drugs'; the comment cites certain examples from that field deserving of its protection and notes that '[t]he same is true of *many* other drugs, vaccines, and the like * * * [and] of *many* new and experimental drugs * * *.' (Emphasis added.) Obviously the comment does not apply to *all* drugs. * * * It is equally obvious that not all drugs are so perfectly designed that they cannot be made more pure or more safe, or that there are not safer, suitable alternatives; nor [*sic*] do the benefits of all drugs necessarily outweigh their risks." (Emphasis *sic*.) Accord *Senn* v. *Merrell-Dow Pharmaceuticals, Inc.* (1988), 305 Ore. 256, 263, 751 P. 2d 215, 218-219, at fn. 4; *Graham* v. *Wyeth Laboratories* (D. Kan. 1987), 666 F. Supp. 1483, 1496.

Accordingly, we hold that a prescription drug, vaccine, or like product is not "unavoidably unsafe" *per se* under Comment *k* to Section 402A of 2 Restatement of the Law 2d, Torts, *supra.* Whether such a product qualifies as "unavoidably unsafe" under Comment *k* is a determination to be made on a case-by-case basis.

## III

Appellants further maintain that the DTP marketed by appellee at the time it was administered to Tyler was not unavoidably unsafe, and that therefore appellee is not entitled to the protection of Comment *k.*

Unavoidably unsafe products are defined by Comment *k* as those "* * * which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use." 2 Restatement of the Law 2d, Torts, *supra,* at 353. It follows, then, that a product is *unavoidably* unsafe if, at the time of its distribution, there existed no alternative design which would have as effectively accomplished the same purpose or result with less risk. See *Toner* v. *Lederle Laboratories, supra,* at 337, 732 P. 2d at 306; *Kearl* v. *Lederle Laboratories* (1985), 172 Cal. App. 3d 812, 830, 218 Cal. Rptr. 453, 464.[5]

### A

Appellants urge that Wyeth could have marketed a DTP containing a fractionated cell pertussis vaccine at the time in question. However, we find that the record does not support this contention.

At the time of the events pertaining to this case, all the licensed private companies and state health departments producing DTP in this country used a whole cell pertussis vaccine. Neither the Lilly fractionated cell vaccine nor the acellular vaccine developed in Japan was licensed by the

---

(1987), 112 Idaho 328, 336, 732 P. 2d 297, 305; *Feldman* v. *Lederle Laboratories* (1984), 97 N.J. 429, 442, 479 A. 2d 374, 381; *Graham* v. *Wyeth Laboratories* (D. Kan. 1987), 666 F. Supp. 1483, 1497.

[5] *Kearl* v. *Lederle Laboratories, supra,* was recently disapproved in *Brown* v. *Superior Court* (1988), 44 Cal. 3d 1049, 245 Cal. Rptr. 412, 751 P. 2d 470.

FDA to any manufacturer for production or marketing in the United States during this period.

Thus, appellee was not licensed by the FDA to manufacture DTP containing either a fractionated cell or an acellular pertussis vaccine at the time Tyler was immunized. As a result, appellee was prohibited by federal law from employing either of these vaccines in its DTP. See Sections 262(a) and (d), Title 42, U.S. Code; Sections 331(d) and 333(a), Title 21, U.S. Code.

In addition, there is nothing in the record that suggests that, at the time in question, appellee could have marketed a safer design of DTP. By 1982, a year prior to Tyler's DTP vaccination, appellee had developed a DTP design based on Lilly's Trisolgen, which utilized a fractionated cell pertussis vaccine. However, the FDA did not grant appellee the license amendment necessary for appellee to market its redesigned DTP. In rejecting the DTP design proposed by appellee, the FDA apparently expressed, *inter alia,* the need for several design improvements, the fact that there had been two adverse reactions to the proposed vaccine during clinical trials, and the fact that there was no conclusive evidence that it was any more effective than DTP made with a whole cell pertussis vaccine. Faced with this defeat, appellee decided to follow the FDA's suggestion that it seek to develop a DTP design based on an acellular pertussis vaccine instead of trying to correct the problems with the proposed vaccine. In view of the foregoing, it was not possible for appellee to have legally marketed a DTP design using a fractionated cell pertussis vaccine at the time Tyler was inoculated. At the time of Tyler's immunization, appellee had purchased an acellular pertussis vaccine from a Japanese company in order to initiate a new DTP study and come up with a safer vaccine.

**B**

Appellants also allege that there is evidence that DTP containing a fractionated cell or acellular pertussis vaccine would be both effective and safer than DTP made with a whole cell pertussis vaccine. We find this evidence to be speculative at best.

Initially, there remains an unsettled question as to whether the pertussis component of DTP is responsible for the more serious adverse reactions that have been temporally associated with DTP vaccinations. At trial, an expert testified that studies have been made comparing the adverse effects following immunization with DTP with those following immunization with DT (a vaccine comprised solely of diphtheria and tetanus components). The results of these studies suggest that the only difference between the adverse effects of the two vaccines is that DTP more frequently causes crying and fever.

There is also a lack of consensus in the scientific community both as to whether endotoxin and pertussis toxin are necessary components of an effective pertussis vaccine, and as to what effects these toxins have on the nervous system.[6] Therefore, there is no conclusive evidence that a fractionated cell vaccine is safer because most of its endotoxin has been removed, or that an acellular pertussis vaccine is safer because not only has most of its endotoxin been removed, but also its pertussis toxin has been inactivated to some extent.

Moreover, no conclusive evidence

---

[6] Indeed, one of appellants' expert witnesses, Dr. Geraghty, testified that there was no guarantee that Tyler would not have had the same adverse reaction if he had been injected with DTP containing a fractionated cell pertussis vaccine.

was adduced at trial indicating that DTP made with a fractionated cell or an acellular pertussis vaccine would be as or more effective than DTP containing a whole cell pertussis vaccine. In fact, no side-by-side comparisons of the relative efficacy of these vaccines have ever been made. It is worth noting, however, that at the time of trial herein, a field trial of two Japanese acellular pertussis vaccines was being conducted in Sweden to demonstrate their efficacy.

## C

In sum, there is no support in the record for appellants' contention that appellee's DTP is not an unavoidably unsafe product. At the time that the DTP marketed by appellee was administered to Tyler, appellee could not have legally marketed DTP containing an alternative pertussis vaccine that would have immunized children against whooping cough just as effectively but with less risk.

## IV

Finally, appellants contend that appellee failed to provide adequate warning with its DTP, and that therefore appellee may be held strictly liable under Comment k.

During the period relevant to this suit, every vial of appellee's DTP was packaged with an insert which set forth the following warning:

"*Side Effects and Adverse Reactions*

"* * *

"The below-listed serious, and occasionally fatal, adverse reactions have been reported following administration of pertussis-vaccine-containing preparations. The incidence of these reactions is unknown, but they seem to be exceedingly rare. Should such reactions occur, further immunization against pertussis is contraindicated.

* * * See also Contraindications and Precautions.

"1. Severe temperature elevations — 105° or higher.

"2. Collapse with rapid recovery.

"3. Collapse followed by prolonged prostration and shock-like state.

"4. Screaming episodes characterized by a prolonged period of peculiar crying during which the infant cannot be comforted.

"5. Isolated convulsion(s) with or without fever.

"6. Frank encephalopathy with changes in the level of consciousness, focal neurological signs, and convulsions with or without permanent neurological and/or mental deficit.[4-9] * * *"

The footnotes in Item 6 of the above-quoted material provided full citations to articles published in accessible medical journals which contained detailed discussions of the nature and reported rates of occurrence of events which were temporally related to the use of DTP:

"4. TOOMEY, J.A.: Reactions to pertussis vaccine. J. Am. Med. Assoc. *139*:448, 1949.

"5. BYERS, B.K., MOLL, F.C.: Encephalopathies following prophylactic pertussis vaccine. Pediatrics *1*: 437, 1948.

"6. BERG, J.: Neurological complications of pertussis immunization. Brit. Med. J. *2*:24, 1958.

"7. STROM, J.: Further experience of reactions, especially of a cerebral nature, in conjunction with triple vaccination: A study based on vaccinations in Sweden, 1959-65. Brit. Med. J. *4*:320, 1967.

"8. STEWART, G.: Vaccination against whooping cough. Efficacy versus risks. Lancet *1*: 234, 1977.

"9. KULENKAMPFF, M. et al.: Neurological complications of per-

tussis inoculation. Arch. Dis. Child. *49*:46, 1974.''

In *Seley* v. *G.D. Searle & Co.,* *supra,* at paragraph two of the syllabus, we held that a manufacturer of an unavoidably unsafe prescription drug provides adequate warning when ''* * * it reasonably discloses all risks inherent in the use of the drug of which the manufacturer, being held to the standards of an expert in the field, knew or should have known to exist.'' We further held that the manufacturer of a prescription drug ''* * * satisfies its duty to warn of risks associated with the use of the product by providing adequate warnings to the medical profession and not to the ultimate user.'' *Id.* at paragraph five of the syllabus.

Herein, the court of appeals concluded that the evidence overwhelmingly demonstrated the adequacy of appellee's warning, and that the trial court should have directed a verdict in favor of appellee on this issue. We agree. All the testimony at trial supported the proposition that the warning was adequate, and perhaps even overly inclusive. Additionally, it was undisputed that the FDA had reviewed and given its approval to the warning in the package insert. Reasonable minds could only conclude that the warning was adequate, and therefore the issue should not have been submitted to the jury.

Taking all the foregoing into consideration, we hereby affirm the judgment of the court of appeals.[7]

*Judgment affirmed.*

MOYER, C.J., HOLMES and WRIGHT, JJ., concur.

H. BROWN, J., concurs separately.

SWEENEY and DOUGLAS, JJ., concur in part and dissent in part.

H. BROWN, J., concurring. I concur in the syllabus, judgment and in much of the majority opinion. I believe that we should apply the ''unavoidably unsafe'' exception in products liability cases, as set forth in the Restatement of Torts 2d. I do not agree with the suggestion that a manufacturer gains the benefit of the unavoidably unsafe exception merely because a safer product has not been licensed by the FDA. Such an interpretation of the law would work against the public interest and could encourage manufacturers to drag their feet in securing FDA approval and in bringing superior, safer products to the market. For me, this case should be resolved entirely on the evidence, or more accurately, the lack thereof. The record does not support a finding that the DTP manufactured by Wyeth was avoidably unsafe.

DOUGLAS, J., concurring in part and dissenting in part. I concur in the majority's syllabus because I agree with the majority that a prescription drug, vaccine, or like product is not ''unavoidably unsafe'' *per se.* Whether such a product is ''unavoidably unsafe'' must be determined on a case-by-case basis.

However, I must dissent from the majority's finding that Wyeth's DTP whole cell pertussis vaccine was ''unavoidably unsafe.'' In 2 Restatement of the Law 2d, Torts (1965) 353, Section 402A, Comment *k*, we find that products are ''unavoidably unsafe'' if, ''* * * in the present state

---

[7] In view of the outcome of this case, we do not find it necessary to address appellants' contention that the trial court erred in denying their motion for prejudgment interest without first holding a hearing.

of human knowledge, [they] are quite incapable of being made safe for their intended and ordinary use."

It is my judgment that Wyeth's DTP whole cell pertussis vaccine was not *un*avoidably unsafe but *avoidably* unsafe because Lilly's DTP fractionated cell pertussis vaccine was safer than Wyeth's whole cell pertussis vaccine. Thus, I think Wyeth should be strictly liable for injuries to Tyler White caused by Wyeth's DTP vaccine. Wyeth's vaccine simply does not fit within the exception to strict liability for injuries caused by defective products expressed in Comment *k* to Section 402A.

The majority finds that the "* * * evidence that DTP containing a fractionated cell * * * vaccine would be both effective and safer than DTP made with a whole cell pertussis vaccine * * * [is] speculative at best." Therefore, the majority does not believe that, given the then state of knowledge, the whole cell pertussis vaccine could have been made safer. The majority refers to studies that compared DTP vaccine to DT vaccine and found that the only difference between the effects of the two vaccines is that DTP more frequently caused minor reactions. However, the reference to these studies confuses the issue, which is whether the DTP fractionated cell pertussis vaccine was safer than the whole cell pertussis vaccine.

A 1978 internal Wyeth memo, not referred to by the majority, discussed a conversation with Dr. Baraff, Assistant Professor of Pediatrics who practiced at the Emergency Medical Center of the UCLA Hospital and Clinic. Dr. Baraff was involved in a large-scale test of the DTP whole cell pertussis vaccine. Eighty percent of the doses the doctor administered were licensed Wyeth DTP whole cell vaccines. The doctor found the *local, generalized* and *systemic* reaction rate to the whole cell vaccine to be "unacceptable." The memo claimed that Dr. Baraff stated that "his feelings are reinforced by phone calls and letters which he receives constantly from practitioners, clinic doctors, and pediatricians in the California area who are equally convinced that the whole virus [*sic*] vaccine is highly reactogenic. * * *" The memo continues that "* * * [t]his is in opposition to prior experience in the pediatric community with the solubilized antigen [*i.e.*, Lilly's Trisolgen vaccine, also referred to in the majority opinion as a DTP fractionated cell pertussis vaccine]."

Thus, contrary to the majority's opinion, there *is* non-speculative evidence in the record that the DTP fractionated cell pertussis vaccine was safer than the whole cell pertussis vaccine.

The majority then contends that there is no evidence that Wyeth could have marketed a DTP fractionated cell pertussis vaccine. However, the record shows otherwise. According to the record, Wyeth acquired rights to Lilly's Trisolgen vaccine, but Wyeth substituted its own bacterial strains into the Lilly "recipe" for the vaccine. Wyeth then attempted to license this vaccine, but the FDA did not grant the license. The FDA suggested changes Wyeth would have to make in this vaccine in order for the FDA to approve it. However, Wyeth made no further attempts to license the vaccine. Thus, the majority's finding that Wyeth could not have marketed a safer design for DTP flies in the face of the evidence.

Wyeth itself, which chose not to produce the Lilly fractionated cell pertussis vaccine even though it had the technical knowledge and legal right to make it, uses the fact that it did not

market it as proof that it could not have produced the safer vaccine. The majority concurs with this conclusion that a drug company's marketing decisions are equivalent to its technical knowledge. However, this is not only factually inaccurate but is bad public policy because it places drug manufacturers that are, understandably, in the business of making and selling products for the profits involved, in charge of determining the quality of the drugs on the market.

Furthermore, the hands-off posture of the majority, which defers to the marketing decisions of drug manufacturers, exists alongside the hands-off attitude of the FDA at the time Tyler White was inoculated. Prior to 1986 and Congress' enactment of the National Childhood Vaccine Injury Act of 1986, Section 300aa-1 *et seq.*, Title 42, U.S. Code, the FDA played a passive role in licensing vaccines. If a drug manufacturer had come to the FDA with an improved drug, the FDA would have decided whether to license it. However, if a drug manufacturer had elected not to improve its drug, the FDA would not have required that the drug manufacturer attempt to make it safer.

Fortunately, Congress awoke to the fact that drug manufacturers were determining the quality of the vaccines in the United States and passed the National Childhood Vaccine Injury Act. Section 2127(a) of this Act requires the Secretary of Health and Human Services to "* * * promote the development of childhood vaccines that result in fewer and less serious adverse reactions than those vaccines on the market * * *." (Section 300aa-27, Title 42, U.S. Code.)

Whatever the future success in obtaining safer vaccines as a result of the 1986 Act, I think it is important that this court adopt a position which will encourage drug manufacturers to improve their drugs. I regret to say that the majority, by its decision today, has not done so.

Accordingly, although I concur with the majority's syllabus, I respectfully dissent from the majority's judgment. I would reverse the court of appeals' decision that Wyeth is not liable for Tyler White's injuries and reinstate the jury's damages award to White.

SWEENEY, J., concurs in the foregoing opinion.