**Melanie Sue ACKLEY, by next friend Tami Sue Ackley, Plaintiffs–Appellants,**

v.

**WYETH LABORATORIES, INC., and Wyeth Laboratories Division of American Home Products Corporation, Defendants–Appellees,**

**Prentice Hall Corporation System; Sooja Kim, M.D.; Madison Pediatrics, Inc., Defendants.**

No. 89–3821.

United States Court of Appeals, Sixth Circuit.

Argued July 27, 1990.

Decided Nov. 26, 1990.

Jeffrey L. Maloon, Maloon & Maloon, Columbus, Ohio and Joseph M. Farrell, Jr. (argued), Hunt & Wilson, Huntington, W.Va., for plaintiffs-appellants.

John M. Mahota, Baker & Hostetler, Columbus, Ohio, Wayne C. Dabb, Albert J. Knopp (argued), Mary M. Bittence, J. Jeffery Zimmerman, Baker & Hostetler, Cleveland, Ohio, Hedy M. Powell, Wyeth–Ayerst Laboratories, Legal Div.; Michael T. Scott, Reed, Smith, Shaw & McClay, Philadelphia, Pa., and Julia Feliciano, Wyeth Laboratories, Inc., Radnor, Pa., for defendants-appellees.

Before KRUPANSKY and BOGGS, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

BOGGS, Circuit Judge.

Melanie Sue Ackley and her mother brought this diversity action against Wyeth Laboratories for injuries allegedly caused by the pertussis (whooping cough) component of a vaccine produced by Wyeth and administered to Ackley as an infant. We affirm the district court's grant of summary judgment to Wyeth.

I.

Wyeth Laboratories (Wyeth) manufactures a DTP (diptheria, tetanus, and pertussis) vaccine that is widely administered to infants at two, four, six, and 18 months. Melanie Ackley, who is represented in this action by her mother, Tami Sue Ackley, was given four administrations of the DTP vaccine as an infant between January 1982 and June 1983. Melanie developed symptoms of seizure and neurological disorder after the six-month administration of the vaccine, in May 1982. Those problems have continued and worsened since that time. Today, Melanie suffers from severe seizures and developmental delay.

The Ackleys brought a diversity action against Wyeth for defective design and failure to warn, under theories of strict liability and negligence. The district court granted summary judgment to Wyeth on all claims.

It is the pertussis portion of the DTP vaccine that is at issue in this case. The pertussis vaccine is of the "whole cell" variety, made from whole, killed *Bordetella pertussis* bacteria. Wyeth is licensed by the Food and Drug Administration to manufacture and distribute DTP containing a whole cell pertussis vaccine. Federal regulations govern the purity, safety, and distribution of the DTP vaccine. 21 C.F.R. § 610, Subparts A and B; § 620, Subpart A. Federal regulations also require that each package contain an insert that lists warnings and contraindications. Wyeth's DTP was packaged with such an insert.

Aside from the whole cell design, there are two other designs for pertussis vaccines: the split cell, or "fractionated," design (marketed by Eli Lilly until 1975 under the name Tri–Solgen), which uses only part of the Bordetella cell; and the "acellular" design (manufactured in Japan in recent years), which uses none of the Bordetella cell. Lilly received FDA approval and a license for Tri–Solgen in the 1960s. In 1975, Lilly voluntarily withdrew from the market and sold its Tri–Solgen design to Wyeth, which had been manufacturing its whole cell vaccine since the early 1960s. The FDA license was not transferrable without reapplication. In the early 1980s, Wyeth modified the Tri–Solgen design to its own specifications, then applied for a license for the resulting fractionated vaccine. The FDA did not grant a license at that time, citing the need for further design improvements, concerns about two adverse reactions in trials of the modified Lilly design, and the lack of conclusive evidence that the modified Lilly design was more effective than Wyeth's whole cell

DTP. Since then, Wyeth has made no further attempts to license a fractionated cell vaccine, and has continued production of the whole cell vaccine.

## II. Strict liability

On appeal, the Ackleys argue that summary judgment was improperly granted on their strict liability and negligence claims as to defective design and failure to give adequate warning. They claim to have raised genuine questions of material fact on those issues.

■ The substantive law of Ohio governs this diversity case. In the area of product liability, Ohio has adopted § 402A of the Restatement (Second) of Torts, which calls for strict liability for the seller of an "unreasonably dangerous" product. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977). Ohio has also adopted *comment k* to § 402A, which recognizes an exception to the rule of strict liability for products that are "unavoidably unsafe." *Seley v. G.D. Searle Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831 (1981). The *comment k* exception acknowledges that certain products are currently "incapable of being made safe for their intended and ordinary use" but nevertheless provide a societal benefit sufficient to justify their production and marketing.

> The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

> Restatement (Second) of Torts § 402A, *comment k.*[1]

■ In *White v. Wyeth Laboratories*, 40 Ohio St.3d 390, 533 N.E.2d 748 (1988), the Ohio Supreme Court held that the Wyeth DTP vaccine was an unavoidably unsafe product, affirming the court of appeals' reversal of a $2.1 million jury verdict for the plaintiff. It based its decision on the facts that Wyeth was licensed by the FDA only to produce the whole cell vaccine, and that the evidence presented by the plaintiff in that case did not show that any alternative was superior to that vaccine. The district court in this case relied on the decision in *White* in granting summary judgment to Wyeth on the issue of strict liability for defective design. The district court noted further that the Ackleys had presented no evidence that Wyeth could have produced a safer vaccine or that Wyeth could have produced any other design of DTP vaccine under FDA regulations.

The Ackleys argue that the district court erred in considering itself to be "bound to hold in all subsequent instances Wyeth's DPT must be deemed 'unavoidably unsafe,'" because of the decision in *White*. Appellants are correct that *White* does not bind the federal courts, as a matter of Ohio law, to the conclusion that Wyeth's whole cell DTP vaccine is an unavoidably unsafe product. The Ohio Supreme Court limited its decision to the facts presented in that case. However, the persuasive authority of the *White* opinion is considerable. In reviewing a substantive question in a diver-

---

1. The term "unavoidably unsafe" is a term of art derived from the Restatement. It does not necessarily mean that the product under consideration would be considered unsafe in normal parlance, or that the product should be considered "ultrahazardous" (Restatement (Second) of Torts § 520), or that the manufacturer of the product would flunk the normal negligence calculus (*Complaint of Paducah Towing Co.*, 692 F.2d 412, 422 n. 18 (6th Cir.1982); *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947)), since "safety" is almost always a matter of degree, and depends both on the particular danger feared, and the benefits to be ob-

tained. Thus, a town in rural western Kentucky may be safer than New York City from crime, but not from earthquakes. Even if the town had a crime rate one one-thousandth that of New York, it might not be considered "safe" as long as any crime occurs, especially if you are the person who is the victim. Finally, to a person who values the cultural attractions of a metropolis, some areas of New York City might be considered perfectly safe (taking into account the benefits to be obtained) at a crime rate considerably higher than that of other places in the country.

sity case, the role of this court is to determine what the highest court of the state would decide on a given question. The authority of the Ohio Supreme Court's conclusion in *White* that Wyeth's DTP is unavoidably unsafe can only be overcome by a plaintiff's presentation of evidence and arguments that were not essentially addressed by the court in *White* and that raise a genuine question of fact that might cause the Ohio Court to rule differently. Because appellants in this case have failed to distinguish their argument for strict liability from the argument presented to the court in *White*, we hold that the district court's granting of summary judgment to Wyeth on the issue of strict liability was correct.

In *White*, the Ohio Supreme Court held that a prescription drug, vaccine, or like product is not "unavoidably unsafe" *per se*, but that it must be determined to be so on a case by case basis. *White*, 533 N.E.2d at 752.[2] The Supreme Court next defined the term "unavoidably unsafe"—"a product is *unavoidably* unsafe if, at the time of its distribution, there existed *no alternative* design that would have as effectively accomplished the same purpose or result with less risk." *Id.* at 753. (emphasis in original). Both of these results were conclusions of law, and are binding on federal courts as expressions of Ohio law.

Finally, the Ohio Supreme Court held that, under the facts presented in *White*, Wyeth's DTP vaccine met the definition of an "unavoidably unsafe" product. This was the application of a legal standard to a specific factual situation. The Ohio Supreme Court necessarily concluded that there existed no alternative design that was safer and as effective as Wyeth's DTP vaccine. The Ohio Court cited the fact that Wyeth was not licensed by the FDA to manufacture either the Lilly (fractionated) design or the Japanese (acellular) design at the time of the plaintiff's vaccination (1983), and that the FDA had rejected Wyeth's application to market the modified Lilly design. It also found the evidence

purporting to show the superiority of the fractionated cell and acellular pertussis vaccines to the whole cell vaccine to be "speculative at best." *Id.* at 753.

> [N]o conclusive evidence was adduced at trial indicating that DTP made with a fractionated cell or an acellular pertussis vaccine would be as or more effective than DTP containing a whole cell pertussis vaccine.

*Id.* 533 N.E.2d at 754.

As an application of law to a particular factual situation, the holding in *White* does not forever close the question whether the DTP vaccine is an unavoidably unsafe product as a matter of Ohio law. The Ohio Supreme Court suggested the limitations of its holding by stating that "there is nothing *in the record* that suggests that ... [Wyeth] could have marketed a safer design of DTP." *Id.* at 753. (emphasis added). Presumably, with a different record, the Court could have reached a different conclusion.

That does not necessarily mean that appellants can survive a motion for summary judgment on that issue, however. Having established that appellants *can* raise a genuine issue of material fact as to whether Wyeth DTP is unavoidably unsafe, the question becomes whether they have done so. This court is bound to apply the facts of this case to the law as the Ohio courts would apply them, and the Ohio Supreme Court has already applied virtually the same facts in such a way as to release Wyeth from strict liability for the effects of its DTP vaccine. This court must do the same, unless appellants present evidence to show that the Ohio Court would see it differently. As a practical matter, that means appellants must produce evidence in this case that is sufficiently different from the facts the Ohio Supreme Court ruled on in *White* that there arises a genuine question whether the Ohio Court would come to a different conclusion in this case.

**2.** Compare the approach of the California Supreme Court, which held that all prescription drugs are unavoidably unsafe (under *comment*

*k*) as a matter of law. *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988).

The Ackleys claim that superior alternatives to Wyeth's whole cell design existed and were available to Wyeth. They seek to present essentially the following story to a jury: Wyeth Laboratories knew as early as 1963 that Eli Lilly's fractionated cell design was superior (in terms of risk of adverse reaction) to its own whole cell design. When it acquired the Lilly design in 1975, it initially considered seeking an FDA license to produce the vaccine exactly as Lilly had produced it. However, when the costs became apparent, that plan was abandoned. As a cost-saving measure, it decided to modify the Lilly design to make it cheaper to produce. It was the cheaper, unproven, modified Lilly design that Wyeth presented to the FDA for license approval. When the FDA rejected the application, Wyeth abandoned the Lilly design altogether and continued to produce the whole cell vaccine, although it knew the design carried a greater risk of adverse reaction. Had it chosen to produce the fractionated vaccine to Lilly's original specifications, Wyeth would have had no trouble obtaining FDA license approval. Therefore, Wyeth's cost-cutting decision led to the production of a more dangerous product.

The plaintiff in *White* presented a very similar story to the Ohio Supreme Court. The dissent in that case shows that the Supreme Court considered and rejected the argument now made by the Ackleys. Justice Douglas stated that in his view, Wyeth's DTP "was not *un*avoidably unsafe but *avoidably* unsafe because Lilly's DTP fractionated cell pertussis vaccine was safer than Wyeth's whole cell pertussis vaccine." *White*, 533 N.E.2d at 756 (emphasis in original). The dissent cites an internal Wyeth memorandum concerning a conversation with Dr. Baraff, Assistant Professor of Pediatrics at U.C.L.A., who found the reaction rate for the whole cell vaccine "unacceptable." [3] The dissent also argues that Wyeth could have marketed a fractionated cell vaccine in the 1980s because it had acquired the rights to the Lilly Tri–Solgen vaccine. It claims that Wyeth could have implemented certain suggested changes by the FDA that would have allowed it to obtain a license for a fractionated cell design vaccine. The dissent's rationale for upholding the jury award to the plaintiff in *White* is the same story presented here by the Ackleys; that Wyeth had the opportunity to produce a safer fractionated cell vaccine on the Lilly design, but that it willfully chose not to do so. We conclude that the Ohio Supreme Court has rejected that story, and that it would continue to do so even under the facts presented by the Ackleys in this case.[4]

The Ackleys object to the district court's focus on the vaccine Wyeth was licensed to produce *at the time of the vaccination.* They would shift the focus of the unavoidably unsafe determination from the time of vaccination (in this case 1982) to the earlier time when Wyeth was deciding which vaccine to produce. The Ohio Supreme Court in *White* and the district court in this case both noted that Wyeth was prohibited by law from manufacturing anything but the whole cell design at the time of distribution of the vaccine to the respective plaintiffs. That point is indisputable. Without an FDA license to produce another design, Wyeth was legally prohibited from distributing either a fractionated cell or an acellular vaccine at the time Melanie Ackley received her vaccinations. The Ackleys, however, argue for emphasizing the question

---

**3.** Dr. Baraff administered the vaccine to 1,500 children and observed adverse reactions in five of them.

**4.** *Graham v. Wyeth Laboratories,* 666 F.Supp. 1483 (D.Kan.1987) was a similar action against Wyeth for injuries allegedly caused by the DTP vaccine. The court denied, *inter alia,* Wyeth's motion for summary judgment on the issues of strict liability and negligent design. The case went to a jury, which awarded damages to the plaintiff. Appellants point to *Graham* as a counterbalance to *White,* showing that the questions of Wyeth's strict liability and negligence are far from closed. However, the district court in *Graham* was interpreting the law of Kansas, not Ohio. It considered a Kansas Supreme Court case holding that a polio vaccine was unavoidably unsafe, but there was no Kansas case analogous to *White,* which directly addressed the Wyeth DTP vaccine. As authority for the likely future rulings of the Ohio Supreme Court, *Graham* is not persuasive in the face of *White.*

of whether an effective and less risky alternative design existed at the time Wyeth made the decision of what vaccine to produce.

The Ohio Supreme Court stated that for the purpose of determining whether a product is unavoidably unsafe, the relevant question is whether alternatives existed "at the time of distribution." [5] It is not clear if this means only at the time that the vaccination in question was administered or during the entire time that the manufacturer distributes its vaccine. Appellants raise the valid point that examining the status of FDA approval only at the time of the vaccination misses alternatives that may have existed at an earlier time, when a decision was made that accounts for the later lack of alternatives. We need not render an interpretation of the precise meaning of the standard described in *White*. What is certain is that the Ohio Court was presented with the same argument that the Ackleys raise here regarding the existence of a alternative fractionated cell vaccine and that the majority rejected that argument.

The Ackleys claim that they have supplied evidence, not used in the *White* case, of Wyeth's intentional decision to continue to produce the whole cell vaccine when it knew that a vaccine based on the fractionated cell design, although costlier to produce, was superior. Taking appellants' interpretations as true, that evidence consists of the following.

1. The deposition of Dr. Robert Waldman, M.D., an expert for appellants, in which he expressed his opinion that both the Lilly design and the Japanese vaccine were safer and could have been produced at the time of Melanie Ackley's vaccination. (J.A. 472)

2. Wyeth documents from 1982 showing that Wyeth officials predicted in the early 1980s that the acellular design would be the state of the art in the future. (J.A. 322, 324).

3. Wyeth documents showing that it had knowledge of the higher risk of its whole cell design since the mid 1970s. (J.A. 326, 331, 350, 353). These consist of: (1) a 1977 letter from Dr. M.Z. Bierly of Wyeth, stating that "we would assume" that whole cell vaccines would have a higher incidence of "systemic (febrile) responses and perhaps local reactions" than Tri–Solgen; (2) a 1976 Wyeth finance committee memo stating that Tri–Solgen is "less reactive" than other vaccines and that the Tri–Solgen design is "superior to any others on the market, including Wyeth's"; (3) a 1980 Wyeth summary of a meeting with members of the FDA's Bureau of Biologics (BuBio) stating that in the Bureau's opinion, whole cell design is efficacious but too reactive; and (4) a 1982 Wyeth summary of a BuBio pertussis conference, at which Bureau officials expressed the opinion that the acellular design looked promising in its use in Japan and that techniques for testing and manufacturing it were available.

4. A 1977 letter from Wyeth Managing Director Alan Bernstein to BuBio stating that in acquiring the Lilly design, Wyeth intended to produce a vaccine that differed little from Lilly's original Tri–Solgen specifications. (J.A. 333)

5. An excerpt from Dr. D.A. Rubin's "Second Quarterly Report" of 1977 stating that Wyeth's laboratory was reporting comparatively low production from "the Lilly protocol," only 20% of the yield from the standard Wyeth method. (J.A. 320)

6. Several medical journal articles discussing the alternatives to the whole cell vaccine, in order to show that Wyeth must have been aware of the safety and efficacy of other designs. Ackley claims to have experts who would testify at trial about the significance of the articles.

7. Evidence showing that Eli Lilly remained licensed (by the FDA) to sell the Tri–Solgen vaccine until 1985, at which time it asked to be de-licensed.

These facts do not sufficiently distinguish appellants' argument from the argument rejected in *White* as to present a

---

**5.** We note that the plaintiff in *White* received his vaccinations at a later date than Melanie Ackley received hers. Therefore, there is no issue of alternatives that existed for Wyeth at the time of the Ackley vaccination that did not exist at the time of the *White* vaccination.

genuine question of fact about whether Wyeth's DTP vaccine is unavoidably unsafe under Ohio law. They consist of preliminary estimates of the quality of the various designs, often by business people for business, rather than medical, reasons. Moreover, they merely reflect the common anecdotal knowledge in the field at the time: that the whole cell vaccine was known to be effective, but that it might be the cause of some adverse reactions; that Lilly's "soluble", or fractionated, design was perceived as less reactive because it did not contain the whole Bordetella cell, but that questions remained about its effectiveness in comparison with the whole cell vaccine; that the Japanese had introduced a new acellular design that looked promising in the early 1980s, but had not yet received adequate testing; and, that no firm medical conclusion had been reached about the relative effectiveness and risk of the various designs. Indeed, the 1980 Wyeth memorandum summarizing the meeting with BuBio officials states that in the opinion of those officials, "there is a lack of adequate clinical data to indicate that the soluble vaccine is as efficacious as whole cell vaccine." (J.A. 350)

The latter point is important. According to the Ohio Supreme Court, a product is unavoidably unsafe if there exists no alternative that is *as effective* and involves *less risk*. *White*, 533 N.E.2d at 753. Within the bounds of the limited medical understanding of the workings of pertussis vaccines, there seems to be a trade-off between effectiveness and risk for the whole cell and split cell designs. The relative effectiveness of the acellular design is only beginning to be understood. The Ohio law dictates that to defeat a claim that a product is unavoidably unsafe, the challenger must show an alternative that is *Paretosuperior* (Cf. 3 *The New Palgrave: A Dictionary of Economics* 806–07, 811 (1987); D. Friedman, *Price Theory: An Intermediate Text* 438–42 (1990)), that is, a product that is *at least* as effective *and* also provides less risk. Appellants cannot state a claim for strict liability merely by showing an alternative that provides an alleged modicum of reduction of risk at the expense of

some loss of effectiveness. Even if we assume that the evidence presented by appellants here was not presented to the court in *White*, that evidence goes only to the safety, not the effectiveness, of the alternative vaccines. Appellants have not established the existence of a genuine issue of fact over whether the alternatives are as effective as the whole cell design.

Today, the whole cell design remains the only design being produced in the United States. (Brief of the United States as amicus at 7–8) Aside from Wyeth, two other American manufacturers and two state health labs produce whole cell pertussis vaccines. A large-scale clinical test of two acellular designs from Japan was performed in Sweden, with preliminary results first available in 1988. They suggest that the acellular vaccines may be less reactive, but also less effective, than the whole cell designs. Although an acellular vaccine is in wide use in Japan, it has the disadvantage that it is not recommended for administration to persons under the age of two years, the time of greatest risk. The United States, as amicus, states that no other pertussis vaccine has been "adequately proven to be both safer than and as effective as the 'whole cell' vaccine." (*Id.* at 4).

## III. Negligence

### A. *Defective design*

The Ackleys claim that Wyeth was negligent in defectively designing its DTP vaccine, by using the allegedly less safe whole cell design. The argument for defective design is essentially the same as the argument for the existence of safer alternative vaccines. It is possible, even after a determination that the Wyeth DTP is an unavoidably unsafe product, for appellants to raise a genuine issue of material fact on the matter of negligent design. However, such an argument would have to allege negligence unrelated to the existence of safer alternative designs, because that issue was necessarily disposed of in determining that the product was unavoidably unsafe, and appellants failed to do so. Therefore, the Ackleys' negligent design

claim can be entirely resolved by the resolution of the strict liability issue.

The district court gave two grounds for its decision to grant summary judgment to Wyeth on the issue of negligence. First, it found that under Ohio law, the doctrines of strict liability (Restatement (Second) of Torts § 402A) and negligence (Restatement § 398) merge in product liability cases, citing *Jones v. White Motor Corp.*, 61 Ohio App.2d 162, 167, 401 N.E.2d 223, 227 (1978). Therefore, the resolution of the strict liability question also resolved the negligence issue.

■ Although appellants' strict liability and negligence claims did merge in this case, we do not believe that *Jones* stands for the proposition that claims of strict liability and negligence always merge in all Ohio products liability cases. If appellants had alleged negligence in the manufacturing of the particular dose given to Melanie Ackley, for example, that negligence claim would be independent of whether the product, as generally manufactured, was found to be unavoidably unsafe. *Jones* cites certain hypothetical cases to illustrate the merger point. However, those cases all represent situations in which both strict liability and negligence apply. *Jones* does not support merger of strict liability and negligence where the theories would result in different outcomes.

■ As a second (and alternative) ground for granting summary judgment to Wyeth on the issue of negligence, the district court stated that the Ackleys had not offered sufficient evidence to substantiate the argument that defendant Wyeth failed to exercise reasonable care in the design of its whole cell vaccine. It quoted from the deposition of Dr. William Cox:

Q. So there's no way you can say had she [Melanie] received the purified form of the vaccine, she absolutely would not have had these problems?

A. That's correct sir.

From Dr. Cox's answer, the district court concluded: "Thus, plaintiffs have failed to meet their burden of proving that defen-

dant Wyeth unreasonably failed to exercise care in designing its DTP vaccine."

As a statement of the standard for a plaintiff's surviving a motion for summary judgment, the district court's remark was incorrect. On a motion for summary judgment, the non-moving party need not prove its case to survive the motion. However, despite the misstatement of the legal standard, we hold that the district court was correct in finding that the Ackleys had failed to raise a genuine issue of material fact on the issue of negligent design.

B. *Adequacy of warning*

■ The Ackleys also allege that Wyeth failed to provide adequate warning of the dangers of the DTP vaccine. The Wyeth vaccine was accompanied by a brochure that stated in part:

**Side Effects and Adverse Reactions**

. . . .

[S]erious, and occasionally fatal, adverse reactions have been reported following administration of pertussis-vaccine-containing preparations. The incidence of these reactions is unknown, but they seem to be exceedingly rare. Should such reactions occur, further immunization against pertussis is contraindicated.

(footnote omitted). The brochure goes on to list several of the adverse reactions, including temperature elevations, collapse, screaming episodes, convulsions, and frank encephalopathy (brain damage).

Ohio has imposed a supplier's duty to warn of unusual product hazards as expressed in § 388 of the Restatement (Second) of Torts, which states that a supplier, direct or indirect, of a product is subject to liability if he:

(a) knows, or from the facts known to him should realize that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Sams v. Englewood Ready–Mix Corp.*, 22 Ohio App.2d 168, 259 N.E.2d 507 (1969).

The adequacy of Wyeth's warning label was also addressed in *White*. The warning contained in the package insert in *White* was identical to the warning in this case. The Ohio Supreme Court stated that:

> All the testimony at trial supported the proposition that the warning was adequate and perhaps even overinclusive.... Reasonable minds could only conclude that the warning was adequate, and therefore the issue should not have been submitted to the jury.

*White*, 533 N.E.2d at 755.

Appellants argue that Wyeth knew of a high rate of serious reactions to whole cell vaccines and other information indicating the superiority of non-whole cell vaccines and that it omitted any reference to such information in its warning label. In particular, the information that appellants claim Wyeth should have revealed included: an incidence of general seizures of one in every three hundred children inoculated with whole cell vaccine (J.A. 347); the fact that half of all children vaccinated would incur fever in excess of 100 degrees, with 5% of those running a fever in excess of 103 degree within 48 hours of injection (J.A. 431); and the fact that the severity and occurrence of reactions was substantially less in non-whole cell vaccines. (J.A. 331, 347)

In order to survive summary judgment on the adequacy of the warning, appellants must present evidence that would raise a genuine question of material fact in light of the decision in *White*. The evidence appellants cite fails to raise such a question. The reported rate of one seizure in every three hundred cases is taken from the Wyeth memo reporting the conversation with Dr. Baraff of U.C.L.A. That document was considered by the court in *White*, as shown by the dissent's reliance

on it. The fact that temperature elevations could occur as a result of administration of the vaccine was included in the list of possible adverse reactions in the warning insert. The relevance of appellant's third assigned omission from the warning—that other vaccine designs were safer—is open to question, even if true. The manufacturer is obligated to make a reasonable disclosure of all the risks inherent in its own drug. *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831 (1981). It is not obligated to provide a comparison of its drug with others.[6]

## IV.

The Ackleys' argument that there are superior alternatives to the whole cell pertussis vaccine and that Wyeth improperly chose not to produce them was rejected by the Ohio Supreme Court on essentially similar facts. We AFFIRM the district court's grant of summary judgment to Wyeth.

---

6. The adequacy of the warning is relevant to the issue of strict liability as well. The Restatement's definition of an "unavoidably unsafe" product includes the proviso that "proper warning is given, where the situation calls for it...." Restatement (Second) of Torts § 402A, *comment k.* Therefore, failure to provide adequate warning, as determined under a negligence standard, would defeat the "unavoidably unsafe" designation of a product that otherwise qualifies for that exception to strict liability. *White* holds that Wyeth's package insert did provide adequate warning.