Argued November 29, 1965, affirmed January 19, petition for
rehearing denied March 8, 1966

## COCHRAN *v.* BROOKE ET AL
### 409 P. 2d 904

*Leo Levenson,* Portland and *E. B. Sahlstrom,* Eugene, argued the cause and filed briefs for appellant.

*William Wheatley,* Eugene, argued the cause for respondents, Sterling Drug, Inc., and Winthrop Laboratories, Inc. With him on the brief were Jaqua & Wheatley, Eugene.

*Richard Bryson,* Eugene, argued the cause for respondents James W. Brooke and others, individually and as partners doing business as Eugene Hospital & Clinic. With him on the brief were Calkins & Bryson, Eugene.

Before MCALLISTER, Chief Justice, and PERRY, SLOAN, GOODWIN, DENECKE, HOLMAN and SCHWAB, Justices.

## SLOAN, J.

Plaintiff has suffered almost total loss of vision which is alleged to have been as a result of taking a drug, chloroquine, prescribed for her treatment by defendant Brooke, an M.D., and manufactured by defendant Sterling Drug Company. In this action she charged Dr. Brooke with malpractice and charged negligence and breach of warranty against Sterling. At the conclusion of the trial all parties moved for a directed verdict. The court found that there was no negligence on the part of either defendant and no breach of warranty as to defendant Sterling. Plaintiff appeals from the judgment entered.

Chloroquine was developed during World War II as a substitute for quinine in the treatment of malaria. Sterling had produced and marketed the drug by the trade name "Aralen." In the early 1950's medical men in the Western World, at least, began to use the drug in treating rheumatoid arthritis. By 1957 the drug was in general use for this purpose. At that time Sterling obtained permission from the Federal Food and Drug Administration to amend its literature on the drug to include recognition of its use for the treatment of arthritis. The literature stated that some visual blurring sometimes accompanied use of chloroquine.

Dr. Brooke was an orthopedist. He began using chloroquine for the treatment of arthritis prior to the time that Sterling had publicized its use for that purpose. He was aware that the drug could cause some temporary visual blurring and other side effects.

Plaintiff, who had suffered from a painful form of arthritis in the spine (ankylosing spondylitis), was referred to Dr. Brooke in June 1958. He prescribed

chloroquine. Her prescriptions were filled with Aralen. She continued using it until July 1961, when she experienced visual loss. Dr. Brooke then discontinued use of the drug. Her loss of vision continued to worsen to the extent that she was virtually blind at the time of trial. There was some conflict in the testimony of the medical experts as to whether or not her condition was caused by taking the drug. Assuming her tragic loss of vision was caused by chloroquine, she was one of the rare persons so affected. There was evidence that she suffered an idiosyncrasy which caused her to be peculiarly susceptible to this uncommon reaction.

 We think it unnecessary to further review the long record compiled from three weeks of trial. The procedural posture of the case required the trial judge to decide the questions of fact. His decision "* * * must be sustained if the record contains any substantial evidence to support the judgment: [citing cases]." *Joseph Milling Co. v. First Bank of Joseph,* 1923, 109 Or 1, 6, 216 P 560. The trial judge found that neither Dr. Brooke nor Sterling were negligent in any of the particulars alleged in the complaint. He also found that the drug, as manufactured by Sterling, contained no impurities, that its chemical content was as represented and that the drug was reasonably safe for the treatment of ankylosing spondylitis. There was ample evidence to sustain the findings. We have no more right to reverse the findings than we would if this were a jury verdict. ORS 17.435; *Leonard v. King,* 1929, 128 Or 216, 274 P 116. Neither plaintiff nor defendants would have been entitled to a directed verdict had either party alone so requested the court to rule. The case was clearly one for the trier of the fact to determine.

■ Thirteen assignments claim the court erred in refusing to admit in evidence numerous brochures, pamphlets and publications which contained reports of doctors who had observed loss of vision by users of chloroquine. Some of the unadmitted documents were published after Dr. Brooke had terminated plaintiff's use of chloroquine and thus were irrelevant to the test of care to be applied in this case. Some of the documents were admitted as against one of the defendants and refused as to the other. When the exhibits were presented the court exercised careful judgment in admitting the offered exhibits that met the test of *Eckleberry v. Kaiser Foundation et al*, 1961, 226 Or 616, 359 P2d 1090, 84 ALR2d 1327 (and similar cases) and rejecting the others. We can find no error in the court's rulings.

The more difficult question in the case is the extent to which strict liability should be imposed upon Sterling as a manufacturer of drugs for human consumption. The strongest statement in favor of such liability is found in new Section 402A, Restatement, Torts 2d. It provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

It has been said that the adoption of this section is one of the most spectacular developments of tort law in this century. Miller, Strict Liability, 1965, 17 Syracuse L Rev 25, 29. Even so the liability is still limited to a defective product. The trial court's finding that the product used by plaintiff was pure and not defective has been mentioned. As pointed out by Judge Wisdom in *Lartigue v. R. J. Reynolds Tobacco Company* (CA 5, 1963) 317 F2d 19 at 36 "* * * a manufacturer of products [for human consumption] is not like one who keeps a tiger for a pet in a crowded city." The liability is not absolute.

Comment (k) to Rule 402A recognizes the precise problem presented here:

*"Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental

drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

■ Plaintiff's theory is that Sterling failed to give adequate and timely warning to those who were dispensing the drug when Sterling first learned that its use could cause permanent eye damage. Whether or not the warning given by Sterling was adequate and timely was a question for the trier of facts. *Lartigue v. R. J. Reynolds Tobacco Co.*, supra, 317 F2d at page 40, and other cases cited by Judge Wisdom.

■■ The far reaching consequences that may ensue if we were to take so bold a step as to impose the absolute liability suggested by plaintiff are beyond the ability of a court to know or comprehend. It is, indeed, easy for compassion to dictate an absolute liability against the makers of a product that can cause blindness. But once the liability is imposed, it could not be judicially limited only to cases involving disastrous consequences. An upset stomach caused by taking aspirin would, as well, entitle the user to his measure of damages. We can agree with the plaintiff that social justice might require that the price of the drugs should include an amount sufficient to create

a fund to compensate those who suffer unanticipated harm from the use of a beneficial drug. But this kind of a system of compensation is beyond the power of a court to impose.

We are satisfied that the record presented here, either as to the law or the facts, does not permit the court to reverse the judgment entered.

Affirmed.