Argued March 1, affirmed April 20, 1966

# LEWIS *v.* BAKER, RICHARDSON-MERRELL, INC.

413 P. 2d 400

*Donald H. Londer,* Portland, argued the cause for appellant. With him on the briefs was Nels Peterson, Portland.

*James Arthur Powers,* Portland, argued the cause for respondent. With him on the brief were Edwin J. Peterson and Tooze, Powers, Kerr, Tooze & Peterson, Portland, and Richard E. Nolan and Davis, Polk, Wardwell, Sutherland & Kiendl, New York, New York.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, GOODWIN, DENECKE, HOLMAN and SCHWAB, Justices.

GOODWIN, J.

Plaintiff brought action against a drug retailer and a manufacturer for damages allegedly resulting from the use of MER/29 (triparanol). The complaint alleged both negligence and breach of warranty. Plaintiff appeals from a judgment entered on a verdict for the manufacturer after the trial court withdrew from the jury's consideration the allegations of breach of warranty. (Plaintiff took a voluntary nonsuit with reference to the retailer, and the retailer is not a party to this appeal.)

The case was tried prior to the publication of our two most recent products-liability decisions: *Wights v. Staff Jennings, Inc.,* 241 Or 301, 405 P2d 624 (1965), which held that a seller of a defective-dangerous product is strictly liable to a nonprivity consumer for injuries caused by breach of warranty of merchantabil-

ity; and *Cochran v. Brooke,* 243 Or 89, 409 P2d 904 (1966), which held that a prescription drug is not a defective-dangerous product if it is reasonably safe for human consumption according to the terms of its maker's representations. The *Cochran* case denied warranty recovery to a prescription patient who suffered from a rare allergy or hypersensitivity to the drug.

In the case at bar, there was no evidence that the drug was defectively manufactured, or that the harmful results from the use of the drug were caused by impurities in the drug. (For such a factual setting, see *Gottsdanker v. Cutter Laboratories,* 182 Cal App 2d 602, 6 Cal Rptr 320, 79 ALR2d 290 (1960).) There was, however, some testimony that the drug in question had a propensity to cause undesired reactions, that it had produced harmful side effects in an unknown number of users, and that it was withdrawn from the market.

As is pointed out in *Lartigue v. R. J. Reynolds Tobacco Company,* 317 F2d 19 (5th Cir), cert. den. 375 US 865, 84 S Ct 137, 11 L Ed 2d 92 (1963), the imposition of strict liability upon suppliers of foods and drugs is so new that generalization is uncertain. It does appear, however, that most contemporary courts, as the cases occur, are adopting a view at least as strict as the one suggested in Comment *k* to Section 402 A of the Restatement 2d, Torts,[1] that suppliers of products intended for intimate bodily use are liable

---

[1] Restatement 2d, Torts § 402 A (1965). "Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(Continued on page 321)

without privity for harms caused by a defective-dangerous product. See cases collected in P. Keeton, *Products Liability-Liability without Fault*, 41 Tex L Rev

(Continued from page 320)

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

"\* \* \* \* \*

"Comment:

"*j. Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.

"But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized. Again the dangers of alcoholic beverages are an example, as are also those of foods containing such substances as saturated fats, which may over a period of time have a deleterious effect upon the human heart.

"Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

"*k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use.

(Continued on page 322)

855 (1963), and Rheingold, *The Drug Manufacturer's Liability,* 18 Rutgers L Rev 947 (1964).

■■ Our holding in *Cochran v. Brooke* conforms with this trend, in that it recognizes the possibility of strict warranty liability in certain cases. *Cochran* stopped short, however, of imposing absolute liability upon the supplier of a prescription drug which is free from defect and is harmful only to allergic or hypersensitive users. Other authorities support this rule. A manufacturer of a properly tested and described prescription drug is not a guarantor[2] against individual

---

(Continued from page 321)

These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

"* * * * *."

[2] While courts do not appear to have adopted such a rationale, commentators suggest that if risk-distribution theories justify enterprise liability, then logically the risk of uniquely personal disasters should fall upon the industry rather than upon the victim. See, e.g., Rheingold, *The Drug Manufacturer's Liability,*

hypersensitivity. *Magee v. Wyeth Laboratories, Inc.,* 214 Cal App 2d 340, 29 Cal Rptr 322 (1963) ; *Mogensen v. Hicks,* 253 Iowa 139, 110 NW 2d 563 (1961), and cases collected in Rheingold, *The Drug Manufacturer's Liability,* 18 Rutgers L Rev at 1003.

We did not intend in the *Cochran* case, however, and we do not now intend to shield from warranty liability a manufacturer who places on the market a drug that turns out to be unreasonably dangerous. The difficult problem, of course, is to define drugs that are, in the language of the Restatement, not "unreasonably dangerous."

In cases involving proprietary merchandise such as hair dye and deodorants, the courts have submitted to the jury conflicting expert testimony on the issue of reasonable safety in a manner very like that used in submitting the issue of reasonable care in a negligence case. See, e.g., *Esborg v· Bailey Drug Company,* 61 Wash 2d 347, 378 P2d 298 (1964) ; *Casagrande v. F. W. Woolworth, Inc.,* 340 Mass 552, 165 NE2d 109 (1960) ; *Crotty v. Shartenberg's-New Haven, Inc.,* 147 Conn 460, 162 A2d 513 (1960).

Prescription drugs present a very different type of problem than do hair dyes or deodorants. They can be purchased only upon an order written by a licensed medical practitioner. In this case, MER/29, as a prescription drug, was approved by the United States Food and Drug Administration in June, 1960. The

---

18 Rutgers L Rev at 1001. Mr. Rheingold, however, does not reject the Restatement limitations. Comment *j,* Restatement, Torts 2d, § 402 A, note 1, supra, would impose upon drug manufacturers at least a duty to exercise due diligence to discover whether or not an allergic class may exist, and to attach a clear warning in cases where the manufacturer knows of such a class or reasonably should know thereof.

official MER/29 warnings ("labeling") approved by the Food and Drug Administration for distribution to the medical profession listed certain adverse effects which had been noted during testing. The labeling was revised from time to time as new information became available. At the time the plaintiff took the drug, in October, 1961, the label had recently been revised to warn against the possibility of certain skin reactions, and advised physicians to take periodic liver-function tests. The drug was withdrawn from the market in April 1962.

From the evidence in the record, the jury could have found either way upon the question whether the manufacturer had disclosed fully to the Food and Drug Administration all known and relevant information concerning the safety of the drug. The verdict for the defendant was, in effect, a finding that there was no willful or negligent mislabeling. We hold that upon such facts a drug, properly tested, labeled with appropriate warnings, approved by the Food and Drug Administration, and marketed properly under federal regulation, is, as a matter of law, a reasonably safe product. Accordingly, a person claiming to have suffered adverse effects from using such a drug, unless he can prove an impurity or an inadequacy in labeling, may not recover against the seller for breach of warranty. See *Cochran v. Brooke, supra.*

From what has been said about the immunity of a prescription-drug manufacturer from warranty liability when federal agency approval has been properly obtained and the drug is marketed with all required safeguards, it follows that upon proof of fraud or culpable nondisclosure in the obtaining or retention of such federal approval there should be no such immunity.

While outright fraud was not alleged in the case below, and is disclaimed in the plaintiff's reply brief, the jury did hear the plaintiff's evidence on an issue of negligence in failing to give adequate warnings concerning possible harmful side effects of the drug. In a somewhat analogous situation, where the trier of fact found that a product alleged to have been negligently assembled was free of the one defect complained of, there could not have been a breach of warranty. Accordingly, the withdrawal by the trial court of the breach-of-warranty issue was held not a reversible error. *Hurley v. Beech Aircraft Corporation,* 355 F2d 517 (7th Cir 1966).

■ Thus, in the case at bar, where the jury necessarily found, in effect, that there was no culpable non-disclosure in the labeling of the drug, even though the jury passed upon that question under a negligence instruction rather than under a warranty instruction, there would appear to be no reversible error in the withdrawal of the warranty issue. No useful purpose could be served by sending the case back for another trial on the issue of culpable nondisclosure. To the extent that the issue was tendered by the pleadings, it was submitted and settled during the trial below. See *United States v. Moser,* 266 US 236, 242, 45 S Ct 66, 67, 69 L Ed 262 (1924). Accordingly, we find no prejudicial error in the withdrawal of the warranty issues.

Other assignments of error challenge particular rulings of the trial court which permitted the defendant's medical experts on the issue of causation to answer certain hypothetical questions, and other rulings which permitted questions that were not hypothetical in form. The latter questions referred, *inter alia,* to a deposition of another doctor, and to medical records

that were called to the attention of the witnesses. Plaintiff objected that these references made it possible for the expert to base his opinion on the opinions of others.

 It is well settled that a hypothetical question or any question which asks the witness to assume the truth of facts given in arriving at his opinion should not include as assumed facts the opinions of others. McCormick, Evidence 29-30, § 14 (1954). There is no showing, however, in the case at bar that any questions asked the experts called for reliance upon the opinions of other doctors.

██ For the most part, while lengthy, the hypothetical questions assumed facts which the jury could accept or reject from other evidence already in the case. For example, whether or not the plaintiff was a diabetic was a disputed matter, but the resolution of this dispute did not depend upon mere opinion. The questions that were not in hypothetical form required the experts to assume the truth of presumably objective entries in designated medical records. At the worst, the documentary material may have included the patient's supposed ailment as an entry on a doctor's record. See McCormick, Evidence 32, § 15 (1954), for the proposal, which we approve, that expert medical witnesses may properly base their opinions upon doctor and hospital charts and records to the same extent that they would normally rely upon the same documents in the treatment of their patients. Objections that such documents are inaccurate, or are improperly authenticated, and the like, can be ruled upon as in the case of any other documents offered in evidence.

 When, in taking expert testimony, there is doubt about the propriety of a question, it should be put in hypothetical form. For purposes of preserving

a record for appeal, the hypothetical question is the most orderly way to elicit the opinion of an expert who has not examined the patient. *Lippold v. Kidd,* 126 Or 160, 164, 269 P 210 (1928). When possible, the trial will be expedited by obtaining rulings upon objections to such questions during recesses, and out of the presence of the jury. In the trial below, hypothetical questions could have been used with certain witnesses to a greater degree than they were used, but we find no reversible error in the sense that incompetent evidence was received.

A final assignment challenges the failure of the trial court to instruct the jury in the manner which the brief asserts was approved in *James v. Falk,* 226 Or 535, 360 P2d 546, 85 ALR2d 1014 (1961). In that decision we set out no approved instruction, but cautioned against the giving of an arbitrary instruction that the jury should disregard an expert's opinion "if any fact stated in any of the questions was not established by the evidence." (Such an instruction could lead to error if the jury should take it literally and consider as fatal an inconsequential discrepancy such as a wrong date.) The opinion points out that the proper instruction, if requested, should advise the jury that in evaluating the doctor's opinion they should disregard it if they find the *material* facts to be other than as assumed by the doctor. The instruction given below properly advised the jury in effect that the expert's opinion should be given such weight as the jury considered it to be worth if it was based upon facts consistent with the facts found by the jury. In the absence of a request for a more precise instruction, there was no error.

Affirmed.