OPINION OF THE COURT
Allen Hurkin-Torres, J.
In this action, it is alleged that plaintiff, Bruce Militrano,[1] was injured when a vaccine, manufactured by defendant Lederle Laboratories, was administered to him by his doctor in 1994. At its core, it is plaintiffs principal contention that, al *525 though all vaccines may contain certain health risks, Lederle could have developed a safer vaccine — a vaccine that allegedly could have been approved by the Food and Drug Administration (FDA) and that could have avoided the injury suffered by plaintiff. Lederle, on the other hand, asserts, inter alia, that this action is barred by the National Childhood Vaccine Injury Act of 1986, which, as will be discussed, is a no-fault system established to provide recompense for children injured by vaccines. Moreover, it asserts that plaintiff’s injuries were the result of unavoidable side effects of a product necessary to prevent pertussis, commonly referred to as whooping cough, and that it provided adequate warnings for the relevant risks. For the reasons that follow, I conclude that this action, to the extent it asserts a claim premised upon an alleged design defect, is barred by the act and must be dismissed. As to those claims not barred by the act, dismissal is also warranted.
Plaintiff received his first diphtheria, tetanus, pertussis (DTP) and haemophilus b conjugate (HIB) vaccinations[2] on January 11, 1994, when he was five weeks old, and his second vaccination, in the form of the combined DTP-HIB vaccination, on March 7, 1994. At that time, plaintiff did not demonstrate any adverse reactions following the first two administrations of the DTP vaccinations. However, following the third vaccination, on August 18, 1994, it is alleged that he suffered injuries causally related to the vaccine.
On April 23, 1996, plaintiffs mother filed a petition on his behalf in the United States Court of Federal Claims seeking compensation under the National Childhood Vaccine Injury Act of 1986 (see 42 USC §§ 300aa-l — 300aa-34) for the injuries he allegedly suffered as a result of the August 18, 1994 administration of the DTP-HIB vaccination, one of the vaccines covered by the act (42 USC § 300aa-14; 42 CFR 100.3). As he was entitled to do under the act (see 42 USC § 300aa-21 [a]), plaintiff elected to reject the award given by the special master in the Court of Federal Claims and pursue civil litigation. Plaintiff commenced this action in May 2001 and has pleaded causes of action with respect to Lederle premised on: (1) strict products liability;[3] (2) negligence in the research, development, manufacturing, and *526 imparting of warnings; and (3) breach of implied and express warranties. ¡
Determination of Lederle’s motion requires some historical background. Pertussis, commonly referred to as whooping cough, is a serious childhood disease and was, at one time, one of the leading causes of death in children in this country. In 1934, this country suffered its worst pertussis epidemic. That year there were 265,000 reported cases and 7,500 pertussis related deaths. By the early 1940’s, pertussis was responsible for 2V2 times the number of deaths of all the following diseases combined: measles, mumps, rubella, diphtheria, polio, meningitis, chicken pox, and scarlet fever (see Graham v Wyeth Labs., Div. of Am. Home Prods. Corp., 906 F2d 1399, 1402 n 2 [1990]).
In order to combat pertussis, drug manufacturers developed the whole cell pertussis vaccine. The whole Bordetella pertussis bacterium was used for the vaccine because scientists had difficulty in determining which of the different antigens were needed to make an effective vaccine. Toxins associated with the whole cell vaccine can cause mild reactions and may cause serious reactions[4] (see id. at 1402-1403; White v Wyeth Labs., Inc., 40 Ohio St 3d 390, 391, 533 NE2d 748, 749 [1988]).
In 1949, the FDA licensed the combined diphtheria, tetanus, pertussis vaccine. Because of this country’s comprehensive vaccination program using (primarily) DTI][5] pertussis has virtually been eradicated here. Pertussis, however] remains a threat, with outbreaks having occurred as recently as October of this year when some parents in Westchester, New York, refused to vaccinate their children (see, Vaccine Refusal is Cited in Whooping Cough Cases, New York Times, Oct. 7, 2003, section B, at 1, col 2). Similarly, when vaccination rates in other countries have declined, the incidence of the disease has increased dramatically (see Graham, 906 F2d at 1402).
In light of the side effects associated with the whole cell vaccination, scientists continued to work on alternatives, including *527 a fractionated cell vaccine marketed by Eli Lilly & Company under the name TriSolgen from 1967 to 1975 and an acellular vaccine developed by the Japanese during the 1970’s and used for all vaccinations there since 1980.
The side effects associated with the whole cell pertussis vaccine and those associated with other vaccines led to a spate of lawsuits against vaccine manufacturers. While there was only one lawsuit filed against a DTP manufacturer in 1978, by 1985 the DTP manufacturers faced 219 lawsuits. The costs associated with defending these lawsuits and maintaining adequate insurance was a factor in the dramatic increase in cost of the vaccine, which went from 110 a dose in 1984 to $11.40 a dose in 1986, with $8 of the increased price going to cover insurance costs alone. These insurance costs were also a factor in the decrease in the number of manufacturers producing DTP, which went from five in 1972 to two by 1984 (see Shackil v Lederle Labs., Div. of Am. Cyanamid Co., 116 NJ 155, 179, 561 A2d 511, 523 [1989]; Brown v Superior Ct., 44 Cal 3d 1049, 1060-1065, 751 P2d 470, 481-483 [1988]).
It was against this historical backdrop that in 1986 Congress enacted the National Childhood Vaccine Injury Act of 1986 (see 42 USC §§ 300aa-l — 300aa-34). As stated in Schafer v American Cyanamid Co. (20 F3d 1 [1994]):
“The [act] represents an effort to provide compensation to those harmed by childhood vaccines outside the framework of traditional tort law. Congress passed the law after hearing testimony 1) describing the critical need for vaccines to protect children from disease, 2) pointing out that vaccines inevitably harm a very small number of the many millions of the people who are vaccinated, and 3) expressing dissatisfaction with traditional tort law as a way of compensating those few victims. Injured persons (potential tort plaintiffs) complained about the tort law system’s uncertain recoveries, the high cost of litigation, and the delays in compensation. They argued that government had, for all practical purposes, made vaccination obligatory, and thus it had a responsibility to ensure that those injured by vaccines were compensated. Vaccine manufacturers (potential tort defendants) complained about litigation expenses and occasional large recoveries, which caused insurance premiums and vaccine prices to rise, and which ultimately threatened the stability *528 of the vaccine supply” (id. at 2).
Under the act, a person injured by a Vaccine may file a claim with the Court of Federal Claims to obtain compensation from a fund that is financed by a tax on vaccines (42 USC §§ 300aa-11, 300aa-12). The petitioner need not prove fault or causation as long as he or she received the vaccine and suffered symptoms contained on the vaccine injury table within a certain time period (42 USC §§ 300aa-13, 300aa-14). The act, however, requires that a person injured directly by a vaccine must first initiate a proceeding in the Court of Federal Claims before he or she may bring a state court tort action against the manufacturer (42 USC § 300aa-11 [a] [2] [A]). For the inost part, the injured person may only initiate a state court tort proceeding if he or she rejects the judgment of the Court of Federal Claims (42 USC § 300aa-11 [a] [2] [A] [i], [ii]; § 300aa-21 [a], [b]). At issue here is the impact of the act on a state court tort action initiated after the injured person has elected to reject the judgment of the Court of Federal Claims.
The act specifically provides that, with certain exceptions to be discussed, once a claimant opts out of a Court of Federal Claims proceeding, “State law shall apply to a civil action brought for damages for a vaccine-related injury or death” (42 USC § 300aa-22 [a]). Relevant here is an exception that provides:
“No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, if the injury or death resulted from side effects that were unavoidable even though the vaccine was properly prepared and was accompanied by proper directions and warnings” (42 USC § 300aa-22 [b] [1]).[6]
Although this section preempts state law to the extent stated, the act, by expressly reserving state courts a role with respect to claims made under the act, does not preclude state courts from adjudicating issues raised regarding it (see Shadie v Aventis Pasteur, Inc., 254 F Supp 2d 509, 517-518 [MD Pa 2003]).
With respect to section 300aa-22 (b) (1), on its face its meaning is not entirely clear. Under one plausible reading of the section, any injury caused by a covered vaccine is deemed “un *529 avoidable” as a matter of law provided that the vaccine was properly prepared and accompanied by proper warnings. Such a reading, which is advocated by Lederle, would bar state tort suits premised upon a design defect theory.
On the other hand, the section could be read as barring defective design claims only where the injury was unavoidable, with a finding of unavoidability being determined on a case-by-case basis. This reading, which is advocated by plaintiff, would permit a jury to determine whether a covered vaccine could have been designed better so as to avoid the injury suffered by plaintiff. Resolution of these competing interpretations requires a tripartite analysis of the legislative history of the act, the Restatement (Second) of Torts, and the case law that existed at the time the act was enacted (see Oklahoma v New Mexico, 501 US 221, 235 n 5 [1991]).
The House Committee report relating to section 300aa-22 (b) (1) states that Congress intended to adopt Comment k of Restatement (Second) of Torts § 402A (see Abbot v American Cyanamid Co., 844 F2d 1108, 1117 [1988] [Wilkins, J., concurring]; HR Rep No. 908, 99th Cong, 2d Sess, at 25-26, reprinted in 1986 US Code Cong & Admin News, at 6366-6367). Section 402A is a general section providing for strict products liability. Comment k states:
“Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical expe *530 rience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.”
The committee’s reference to Comment k, however, provides no clear guidance since the Comment itself suffers from the same ambiguity as section 300aa-22 (b) (1).
As to the relevant case law at the time the act was adopted, in 1986 courts had not yet reached a consensus on the meaning of Comment k, or the proper treatment of prescription drugs in design defect litigation. Thus, while some courts concluded that a case-by-case analysis was necessary to determine whether a prescription drug was unavoidably unsafe, i.e., that it could have been made safer by a better design (see e.g., Kearl v Lederle Labs., 172 Cal App 3d 812, 829-831, 218 Cal Rptr 453, 463-465 [1985], disapproved by Brown v Superior Ct., 44 Cal 3d 1049, 1060-1065, 751 P2d 470, 481-483 [1988]; Feldman v Lederle Labs., 97 NJ 429, 446-447, 479 A2d 374, 383 [1984]), others concluded that prescription drug manufacturers were generally not liable for design defect claims (see e.g. Davis v Wyeth Labs., Inc., 399 F2d 121, 128 [1968]; Christofferson v Kaiser Found. Hosps., 15 Cal App 3d 75, 79, 92 Cal Rptr 825, 827 [1971]; McDaniel v McNeil Labs., Inc., 196 Neb 190, 200-202, 241 NW2d 822, 828-829 [1976], overruled by Freeman v Hoffman-LaRoche, Inc., 260 Neb 552, 618 NW2d 827 [2000]; Lewis v Baker, 243 Or 317, 324, 413 P2d 400, 404 [1966]).
Congress, of course, is presumed to have been aware of the debate concerning Comment k in this genre of litigation (see Miles v Apex Mar. Corp., 498 US 19, 32 [1990]; Goodyear Atomic Corp. v Miller, 486 US 174, 184 [1988]). This being so, the language in the House Committee report supports the conclusion that Congress intended to view Comment k and the act as immunizing vaccines from liability for design defects (see Garcia v United States, 469 US 70, 76-78 [1984] [in surveying legislative history, the authoritative source lies in the committee *531 reports on the bill]; cf. Bank One Chicago, N.A. v Midwest Bank & Trust Co., 516 US 264, 276-279, 279-283 [1996] [Stevens, J., concurring]).
Thus, for example, the committee report states: “The Committee has set forth Comment K in this bill because it intends that the principle in Comment K regarding ‘unavoidably unsafe’ products . . . apply to the vaccines covered in the bill and that such products not be the subject of liability in the tort system” (emphasis added).
The report also states:
“Given the existence of the compensation system in this bill, the Committee strongly believes that Comment k is appropriate and necessary as the policy for civil actions seeking damages in tort. Vaccine-injured persons will now have an appealing alternative to the tort system. Accordingly, if they cannot demonstrate under applicable law either that a vaccine was improperly prepared or that it was accompanied by improper directions or inadequate warnings [they] should pursue recompense in the compensation system, not the tort system” (HR Rep No. 99-908, 99th Cong, 2d Sess, at 26, reprinted in 1986 US Code Cong & Admin News, at 6367 [emphasis added]).
What therefore emerges from a juxtaposition of the various authorities and sources is that the overall purpose of the act was to provide a means of compensation for those harmed by childhood vaccinations while at the same time limiting the insurance and litigation costs of vaccine manufacturers (see Terran ex rel. Terran v Secretary of Health & Human Servs., 195 F3d 1302, 1306-1307 [1999]; Schafer, 20 F3d at 2). Given the clear intent to limit manufacturer liability, and the forceful statements in the committee reports, I conclude that Congress did not intend that national vaccine policy be determined by the vagaries of a jury’s determination on a case-by-case basis.
Accordingly, I conclude that 42 USC § 300aa-22 (b) (2) bars any design defect claim brought by plaintiff,[7] and Lederle is entitled to summary judgment dismissing such claims. In any event, even assuming Congress did not intend to preclude design defect claims, I would still find that Lederle is entitled to sum *532 mary judgment dismissing plaintiffs complaint under traditional common-law principles of strict likbility.
Initially, it should be observed that, in addressing the common law, one must return back to an examination of Comment k of the Restatement. In this regard, Cdmment k has remained the centerpiece of virtually all prescription drug litigation, and a raging debate concerning its scope and application has endured until the present.
Thus, since 1985, a minority of courts [have held that any prescription drug is deemed unavoidably uiisafe for purposes of application of Comment k, and thus, that defective design claims with respect to such drugs — at least those premised upon strict liability — are barred (see e.g. Brown v Superior Ct., 44 Cal 3d 1049, 1060-1065, 751 P2d 470, 481-483 [1988]; Grundberg v Upjohn Co., 813 P2d 89 [Utah 1991]; Young v Key Pharms., Inc., 130 Wash 2d 160,166-170, 922 P2d 59, 62-65 [1996]; Winchester, Section 8[c] of the Proposed Restatement [Third] of Torts: Is It Really What the Doctor Ordered?, 82 Cornell L Rev 644, 653-655 [1997]). The majority of courts, however, have applied a case-by-case approach in which they consider Comment k an affirmative defense and apply a risk/utility balancing test in which the availability of other drugs addressing the same problem is considered in determining whether the particular drug at issue is unavoidably unsafe (see e.g. Hill v Searle Labs., Div. of Searle Pharms., Inc., 884 F2d 1064, 1068-1070 [1989]; Castrignano v Squibb & Sons, 546 A2d 775, 781 [RI 1988]; Toner v Lederle Labs., Div. of Am. Cyanamid Co., 112 Idaho 328, 339-342, 732 P2d 297, 308-311 [1987]; Freeman v Hoffman-La Roche, Inc., 260 Neb 552, 561-569, 618 NW2d 827, 836-840 [2000]; Feldman, 97 NJ at 446-447, 479 A2d at 383 [1994]; White, 40 Ohio St 3d at 395, 533 NE2d at 752-753 [1989]; Torburg, Design Defect Liability and Prescription Drugs: Who’s in Charge?, 59 Ohio St LJ 633, 639-641).
Decisions favoring a broad application of Comment k (i.e., the minority view) emphasize factors such as: (1) the heavy regulation of the drug industry by the FDA; (2) that drugs, although dangerous, may be necessary to alleviate pain or sustain life; (3) that subjecting manufactures to tort liability may affect the price and availability of necessary drujjs and discourage the development of new drugs (Brown, 44 Cal 3d at 1063-1065, 751 P2d at 482-483; Grundberg, 813 P2d at 95-99). On the other hand, decisions favoring a case-by-case application (i.e., the majority view) emphasize that there is nothing so unique about *533 prescription drugs that warrants a blanket exception to liability (see Hill, 884 F2d at 1069), especially where there is a reasonable alternative design (see Freeman, 260 Neb at 566-567, 618 NW2d at 839). They further emphasize that blanket immunity from tort liability would remove an incentive for developing safer designs (see Toner, 112 Idaho at 341, 732 P2d at 310).
As to the New York approach, in Martin v Hacker (83 NY2d 1, 8 [1993]), the Court of Appeals stated that
“Although a prescription drug is by its nature an inherently unsafe product and would in the usual case impute strict liability to its manufacturer, a defense is provided against such liability when the drug is ‘ “properly prepared, and accompanied by proper directions and warning” ’ (Wolfgruber v Upjohn Co., 72 AD2d 59, 61, affd 52 NY2d 768 [quoting Restatement (Second) of Torts § 402 A, Comment &]; see generally, Reingold, Products Liability— The Ethical Drug Manufacturer’s Liability, 18 Rutgers L Rev 947 [1964]; 2 Frumer and Friedman, Products Liability § 12.14, at 12-147 to 12-149 [1993 revision and July 1993 Cum Supp]). Therefore, even though its side effects may cause injury, a prescribed drug, accompanied by adequate warnings, is ‘ “not defective, nor is it unreasonably dangerous” ’ (Wolfgruber, supra at 61).” (Emphasis added.)
This language, of course, strongly suggests that the Court of Appeals has adopted the more restrictive minority approach, an approach that would preclude design defect liability in this case. However, what makes this conclusion problematic is that this statement in Martin is dicta, since the Court was addressing a failure to warn claim, and no design defect claim was before the court.[8] The Appellate Division decision in Wolfgruber, which is quoted in Martin, likewise only involved a failure to warn claim (see also Enright v Eli Lilly & Co., 77 NY2d 377, 388 [1991] [the Court’s favorable citation to Brown v Superior Ct. (44 Cal 3d 1049, 751 P2d 470) suggests that the New York Court of Appeals has adopted a restrictive approach to prescription drug liability as a matter of public policy]).
While Martin, Wolfgruber, and Enright lead me to believe that our courts should follow the minority view in this genre of *534 litigation, this policy laden decision need not be made at this time. In this regard, even under the majority approach, liability in this action may not ensue because there was no reasonable alternative to the whole cell pertussis vaccine at the time it was administered to plaintiff.
Plaintiff contends that vaccines based on fractionated cells or acellular components could have been marketed at the time of the plaintiffs third inoculation, and thai this alternative design would have had the same efficacy as the whole cell vaccine, but without the same side effects associated with the whole cell vaccine. Lederle’s expert, however, notes that, while Lederle received FDA approval to market a DTaP vaccine (a combined diphtheria, tetanus and pertussis vaccine with an acellular pertussis component) in 1991 (marketed under the name AcelImmune), the approval was limited to the fourth and fifth shots of the five shot series for toddlers. At that time, approval was not given for the first three shots in the series because of the lack of data in support of the efficacy of the acellular pertussis component of the vaccine. The FDA did ¡not approve the use of the DTaP vaccine for all five doses of ; the vaccination series until 1996, and this approval was based upon the results of extensive efficacy and safety trials conducted in Germany. As such, at the time the plaintiff was receiving his immunizations in 1994, only the DTP vaccines with a whole cell pertussis component were approved for the first three shots in the series.
With respect to the combined DTP-HIB vaccine (marketed under the name Tetramune) that plaintiff received for the second and third immunizations, Ledeiie’s expert notes that Lederle had attempted to create a DTaP-HIB combined vaccination using an acellular pertussis component, but Lederle’s own clinical trials relating to the first three shots in the series revealed that the acellular pertussis component interfered with the HIB component and resulted in lower immunogenicity titers for the HIB vaccine.[9] Lederle’s expert also points to a report stating that the use of combined vaccinations is preferred over separate injections of component vaccines because the use of such vaccines might improve timely ¡vaccination coverage because of: (1) provider and parental concern over the number of injections an infant receives at a single visit; (2) the reduction of costs of storing and stocking such vaccines; (3) the reduction of costs as a result of limiting extra health care visits and *535 facilitating the addition of new vaccines into immunization schedules (see Centers for Disease Control and Prevention, Combination vaccines for childhood immunization: recommendations of the Advisory Committee on Immunization Practice, the American Academy of Pediatric, and the American Academy of Family Physicians, MMWR 1999:48 [No. RR-5]). Through such evidence, Lederle has shown, prima facie, that it could not have marketed a reasonable alternative to the whole cell pertussis component of the DTP vaccine in 1994.
In opposition, plaintiff’s expert, Mark Geier, M.D., submits that Lederle should have been able to develop an acellular pertussis vaccine decades earlier than it actually did. In support of this proposition, Dr. Geier points to a 1953 study purporting to show that a “non-cellular” pertussis vaccine was as effective as the whole cell vaccine without the negative side effects (Felton and Verwey, The Epidemiological Evaluation of a Non-Cellular Pertussis Antigen, 16 J Pediatrics 637 [Nov. 1955], Geier affidavit, exhibit 6). Dr. Geier also points to various patents for fractionated or acellular pertussis vaccines, including one for a fractionated cell vaccine marketed by Eli Lilly & Company under the name TriSolgen and to the Japanese acellular vaccine, which was developed during the 1970’s and has been used for all immunizations in Japan since 1980.
With respect to TriSolgen, which had been developed by Lilly in the 1950’s, approved by the FDA in 1967, and marketed by Lilly until 1975, when Lilly withdrew from the vaccine market (see Graham v Wyeth Labs., Div. of Am. Home Prods. Corp., 666 F Supp 1483, 1486 [1987] [D Kan]), Dr. Geier does not identify any large scale clinical studies (see Conner and Speers, A Comparison Between Undesirable Reactions to Extracted Pertussis Antigen and to Whole-Cell Antigen in D.P.T. Combinations, 8 J Iowa Med Socy 340, 341 [Geier affidavit, exhibit 16]) showing it to be as efficacious as the whole cell vaccine or make any showing that the FDA’s approval of it in 1967 demonstrates that it would have been approved at a later date. Although not in the record before the court, it is noteworthy that when Wyeth Laboratories (an entity that apparently now owns, or is part of the companies that include, Lederle) attempted to continue to market TriSolgen in 1982, the FDA refused its application (see Miller v Connaught Labs., Inc., 1995 WL 579969, 1995 US Dist LEXIS 14470 [D Kan, Sept. 13, 1995]; White, 40 Ohio St 3d at 396, 533 NE2d at 753). The denial was apparently premised on the need for design improvements, the inability of Wyeth to *536 show that the fractionated cell vaccine was more effective than the whole cell vaccine and the fact that two negative reactions had occurred during the clinical trial (White, 40 Ohio St 3d at 396, 533 NE2d at 753; Ackley v Wyeth Labs., Inc., 919 F2d 397, 402-403 [1990]). Rather than attempt to correct the problems, Wyeth chose to follow the FDA’s suggestion that it develop an acellular vaccine (id.).[10]
With respect to the Japanese acellular vaccine, there is no dispute that it is either the same or essentially the same as the acellular vaccine ultimately approved by the FDA. Dr. Geier asserts that he “personally talked to Dr. 'Esber of the FDA who suggested that before 1990, there was enough data to support a license for an acellular DTP for use in all of the vaccine schedule.” This conclusory assertion, however, is not otherwise supported by plaintiffs papers.
In other materials submitted by Dr. Geier from the mid-1980’s, the authors state that development of an acceptable acellular vaccine had been delayed by the inability to identify the pertussis antigens to be incorporated in the vaccine (see Sekura, Clinical, Metabolic, and Antibody Responses of Adult Volunteers to an Investigational Vaccine Composed of Pertussis Toxin Inactivated by Hydrogen Peroxide, 113 J Pediatrics 806 [1988]; Committee on Issues and Priorities for New Vaccine Development, New Vaccine Development, Establishing Priorities, 1 Diseases of Importance In the United States, at 173 [1985]; Pittman, The Concept of Pertussis as a Toxin-Mediated Disease, 3 Pediatric Infectious Diseases 467, 480 [1984] [Geier affidavit, exhibits 8, 9, 13]). One of thése authors also states that at the time of the report, “progress” was being made toward the development of methods for efficient manufacture of an acellular vaccine, development of laboratory methods to compare the potency of the acellular vadcine against the whole cell variety and the development of methods to determine the human serological response to the specific antigens in the acellular vaccine compared to the whole cell vaccine (see Pittman, The Concept of Pertussis as a Toxin-Mediated Disease, 3 Pediatric Infectious Diseases 467, 480 [Geier affidavit, exhibit 13]).
The Committee on Issues and Priorities for New Vaccine Development (see New Vaccine Development, Establishing *537 Priorities, 1 Diseases of Importance In the United States [Geier affidavit, exhibit 9]) noted that an improved acellular vaccine was a “realistic possibility.” The committee, however, foresaw that it would take five years to bring a product to the point of licensure. While the committee assumed that one to two years of development time would be saved if the Japanese vaccine proved to be safe and effective, it noted that the safety and efficacy of the Japanese vaccine had not been formally reported. The committee also noted that potential problems with respect to the approval of the acellular vaccine included the logistical, legal, and ethical issues associated with conducting clinical trials.
A 1988 report relating to a study on adults notes that the safety and efficacy of the acellular vaccine still needed to be studied for infants (see Sekura, Clinical, Metabolic, and Antibody Responses of Adult Volunteers to an Investigational Vaccine Composed of Pertussis Toxin Inactivated by Hydrogen Peroxide, 113 J Pediatrics 806 [Geier affidavit, exhibit 8]). A May 1996 article, which notes that the whole cell vaccine is generally safe and effective, states that “[Recommendations for the use of the DTaP for primary immunizations in children younger than 15 months await results from ongoing efficacy trials in Europe and elsewhere” (see Rosenthal, The Safety of Acellular Pertussis Vaccine vs Whole-Cell Pertussis Vaccine, 150 Archives of Pediatric & Adolescent Med 457 [1996] [Geier affidavit, exhibit 42]). Indeed, a 2001 article submitted by plaintiff notes that the merits of the new acellular vaccine with respect to potency is still a subject of debate (see Donnelly, Whole-Cell but Not Acellular Pertussis Vaccines Induce Convulsive Activity in Mice: Evidence of a Role for Toxin-Induced Interleukin-ß in a New Murine Model for Analysis of Neuronal Side Effects of Vaccination, 69 Infection & Immunity 4217 [2001] [Geier affidavit, exhibit 36]). Thus, many of the reports and articles relied upon by Dr. Geier cut against his unsubstantiated assertion that Lederle could have obtained FDA approval for an acellular vaccine with data available in 1990.[11]
In sum, Dr. Geier’s eonclusory and scattershot affidavit, which is undermined by many of the materials submitted in support of *538 it, fails to demonstrate that a viable alternative to the whole cell pertussis component of the DTP-HIB vaccine could have been marketed at the time the vaccine jvas administered to the plaintiff here. While the FDA is a passive agency that decides whether or not to approve vaccine designs when a manufacturer submits a proposal (see Hurley v Lederle Labs., Div. of Am. Cyanamid Co., 863 F2d 1173, 1177 [1988]), the record demonstrates that the FDA and the scientific community in this country had concerns regarding the efficacy of the acellular vaccine that precluded its earlier approval. While each case must rest upon the facts before the court, this conclusion is also supported by a majority of the decisions that have considered the availability of the acellular vaccine when faced with a similar evidentiary record (see Ackley, 919 F2d 397 [1990]; Miller, 1995 WL 579969, 1995 US Dist LEXIS 14470; Pease, 795 F Supp 755 [1992]; Jones v Lederle Labs., Div. of Am. Cyanamid Co., 785 F Supp 1123, 1127 [ED NY 1992] [in granting defendants judgment as a matter of law, the court stjated that “even today (1992), years of further development and testing will be required before a more advanced vaccine for two-month-old infants will be available in this country”], affd 982 F2d 63, 63-64 [1992]; Koehler v Wyeth Labs., 1987 WL 47831, 1987 US Dist LEXIS 16861 [SD Ind, Sept. 8, 1987]; White, 40 Ohio St 3d at 396, 533 NE2d at 753; but see Graham, 666 F Supp at 1497, affd in part and revd on other grounds 906 F2d 1399 [1990]; Foyle v Lederle Labs., 674 F Supp 530 [1987] [ED NC]). In the absence of a viable alternative to the whole cell vaccine, plaintiff’s strict liability design defect claim must fail because the whole cell pertussis vaccine is not an unreasonably dangerous product (see Felix v Akzo Nobel Coatings, 262 AD2d 447, 448 [1999]; Jones, 785 F Supp at 1127) and if it must be so deemed, it is an unavoidably unsafe product for purposes of 42 USC § 300aa-22 (b) (1) and Comment k under New York law.
One final observation is warranted concerning plaintiffs argument that a safer drug could have been designed and approved by the FDA. According to section 6 (c) of the Restatement (Third) of Torts, a plaintiff may not prove defectiveness by showing that the defendant manufacturer could have designed and marketed a safer prescription product that has not received FDA approval and is therefore not on the market. As explained by the former reporters of the American Law Institute’s Restatement (Third): !
*539 “Such refusal rests not on deference to the FDA but on an understandable reluctance to allow courts to determine whether a proposed alternative drug would have received FDA approval. Development by a manufacturer of a safer alternative drug does not, by itself, help anyone. For physicians to prescribe such a safer drug, it must reach the market. To reach the market, a prescription drug must be approved by the FDA. Thus, the question of whether a new alternative drug should have been developed by the defendant must be recast as whether the proposed alternative drug would have won FDA approval in time to help the plaintiff. No court can answer that question without seeking, in some manner, to replicate the FDA approval process. A brief description of the FDA approval process reveals why courts could never hope successfully to undertake such an inquiry.
“To obtain FDA permission to market a prescription drug, a manufacturer must develop extensive information about the safety and efficacy of the proposed drug through human clinical trials. The formal approval process begins with the manufacturer’s submission of an investigational new drug application (IND) to conduct such clinical trials. Before the FDA will consider an IND, biologically active agents of the proposed drug must have been subjected to comprehensive animal and human tissue testing. Protocols for human testing must be detailed. Only if the FDA does not object to the IND application, either by requesting more information or by seeking modifications to the protocols for clinical testing, may the manufacturer commence with human clinical trials. On average, the investigation and testing necessary for the preparation and approval of an IND application take eighteen months. “Human clinical trials take place in three phases and typically take five years or more to complete. The clinical trials are staggered not only to maximize information, but also to protect the well-being of the participants. Phase I clinical trials require that tests be performed on a limited group of healthy adults. These tests are designed to provide information about ‘the metabolism and pharmacologic action of the drug in humans [and] the side effects associated with increasing doses.’ This initial *540 stage is designed primarily to discover dangers related to ingestion of the drug and does not focus on the drug’s efficacy. If Phase I is completed successfully, the manufacturer proceeds to Phase II in which the efficacy of the drug is evaluated in a controlled study. Researchers dispense the drug to several hundred patients suffering from a condition to determine whether the drug ameliorates the condition. If the second phase is successful, the drug is then provided to several thousand patients under the direction of many physicians who report to the drug manufacturer in Phase III. The FDA may at any stage require additional testing or studies before allowing the manufacturer to proceed with further clinical trials. As Professor Michaél Green observes, ‘the winnowing of potential new drugs during the IND process is in significant part responsible for the fact that it takes, on average, twelve years and costs more than $200 million to develóp and obtain approval for a new drug.’ Only upon completion of IND testing does the manufacturer submit a New Drug Application (NDA) to the FDA. Three-fourths of all drugs that are subjected to human clinical trials never reach the NDA stage. An NDA record frequently runs in the hundreds of thousands of pages, cataloguing the entire history of the drug’s development and reporting on all the premarketing studies. Negotiations between the FDA and the manufacturer regarding whether a drug should be approved for marketing can continue indefinitely even after the filing of the NDA and throughout its review.
“In light of these realities, the insistence by our critics that the Restatement should apply the same RAD-based standard to prescription products as it applies generally to all other products is manifestly improvident. Given that a drug manufacturer cannot market a drug in the United States without FDA approval, for a court to find that an alternative drug should have been developed would require it to predict with confidence that the alternative drug would have actually been approved. No expert could honestly opine that approval would have been granted without engaging in rank speculation. The approval process is accompanied by countless opportunities to decline or delay further progress. The *541 data required to be developed for drug approval are beyond the capabilities of the litigants to replicate in a trial setting. Trials are compressed in time and scope; they do not allow for the expansive multiyear analysis and interaction between the manufacturer and the FDA that characterize the American drug regulatory process. Even if comparing a defendant’s drugs with drugs that might have been developed made sense substantively (it does not), from the standpoint of legal process it could never be accomplished fairly or sensibly.” (Henderson and Twerski, Drug Designs are Different, 111 Yale LJ 151, 163-167 [2001].)
The argument proffered by the reporters, it seems to me, are so compelling that plaintiffs claim should be rejected on this basis alone.
Turning to plaintiffs remaining claims, they too are without merit. Thus, with respect to plaintiffs negligent design defect claim, that claim must be dismissed for the same reasons as the strict liability claim (see Ackley, 919 F2d at 403-404; cf. Giunta v Delta Intl. Mach., 300 AD2d 350, 353 [2002]).
While a breach of an implied warranty claim retains a theoretical underpinning distinct from a strict liability design defect claim under New York law (see Denny v Ford Motor Co., 87 NY2d 248, 254-264 [1995]), here there is no difference in the evidence submitted with respect to a defect in terms of strict products liability and a defect in terms of a breach of implied warranty that would warrant a different finding under plaintiffs breach of implied warranty claim (see Fritz v White Consol. Indus., 306 AD2d 896, 897-898 [2003]; Castrignano, 546 A2d at 783 [Comment k applied to breach of implied warranty claim]). In any event, even if the theoretical difference would not preclude an implied warranty claim under New York law, since Lederle has shown that the vaccine is unavoidably unsafe under 42 USC § 300aa-22 (b) (1), that section — which does not differentiate between causes of action based upon theories of recovery — bars plaintiff from recovering under an implied warranty theory.
With respect to plaintiffs express warranty claim, there is no evidence that Lederle expressly warrantied that injuries such as those suffered by the plaintiff would not occur.
Finally, while the warnings submitted along with Lederle’s vaccine stated that a causal connection between injuries *542 such as those suffered by plaintiff and the administration of a whole cell pertussis vaccine had not been shown, they clearly stated that there is a temporal association between conditions like that suffered by the plaintiff and the administration of the vaccine. Given that the causal connection between the administration of the whole cell vaccine and the more serious side effects that may be temporally related to it is still an issue of debate in the scientific community (see Barlow, The Risk of Seizures After Receipt of Whole-Cell Pertussis or Measles, Mumps, and Rubella Vaccine, 345 New England J Med 656 [2001]; Donnelly, Whole-Cell but Not Acellular Pertussis Vaccines Induce Convulsive Activity in Mice: Evidence of a Role for Toxin-Induced Interleukin-ß in a New Murine Model for Analysis of Neuronal Side Effects of Vaccination, 69 Infection & Immunity 4217 [2001] [Geier affidavit, exhibits 32, 36]; see also DPT Vaccine and Chronic Nervous System Dysfunction: A New Analysis [report prepared by the Institute of Medicine, attached as exhibit 2 to plaintiffs mem in opposition]), plaintiff has not shown a factual issue with respect to the accuracy of that aspect of the warning. Moreover, nothing plaintiff has submitted shows that the warnings misstate the frequency of these temporally related side effects. When read as a whole, the warnings supplied by Lederle sufficiently detail the risks of the vaccine that it is entitled to summary judgment dismissing the warning claim, whether premised on negligence or strict liability (see White, 40 Ohio St 3d at 397-398, 533 NE2d at 754-755; see also Martin, 83 NY2d at 8 n 1, 10-16). Lederle is thus entitled to dismissal of the warning claim regardless of whether it made the initial showing required for application of the presumption set forth in section 300aa-22 (b) (2) of the act (42 USC § 300aa-22 [b] [2]) — a presumption which deems warnings to be sufficient under certain circumstances.
In the end, the issue in this action should not be whether there was some speculative, theoretical ^possibility that Lederle could have designed and brought to market a safer vaccine. Rather, the issue is whether fundamental issues of national vaccine policy should be left to the vagaries of a jury’s determination on a case-by-case basis. Since I believe, among other things, that the National Childhood Vaccine Injury Act precludes such an outcome, this action should be dismissed.

. All references to plaintiff are to the infant plaintiff.

. It is unclear from the record whether the first DTP and HIB conjugate vaccines were administered in the combination form at the time of the initial vaccination.

. Plaintiff does not particularize whether his strict products liability claims encompass claims premised on defective design, defective manufacture and/or inadequate warnings and plaintiff did not clarify his claims against *526 Lederle in his bill of particulars. Given the arguments made in the instant motion, plaintiff has effectively waived any manufacturing defect claim.

. For the purposes of this motion, Lederle does not dispute the issue of causation or that whole cell pertussis vaccination may very rarely cause serious side effects.

. Except for a fractionated cell pertussis vaccine approved by the FDA in 1967 and marketed until 1975, the whole cell pertussis vaccine was the only pertussis vaccine approved by the FDA until the acellular vaccine was approved for the last two shots in the five shot series in 1991 and for all five shots in 1996.

. Another exemption limits a manufacturer’s liability with respect to warnings (42 USC § 300aa-22 [b] [2]).

. Plaintiff does not assert that there was any defect with the preparation or manufacture of the vaccine and, as is discussed infra, the warnings supplied were adequate.

. While the Appellate Division and Court of Appeals addressed a defective product claim in Bichler v Eli Lilly & Co. (79 AD2d 317 [1981], affd 55 NY2d 571 [1982]), application of Comment k to such a claim was not before either Court.

. This conclusion is also supported by the deposition testimony of Dr. Mary Richard, supplied by Lederle in support of its motion.

. Whether Dr. Geier’s advocacy of TriSoIgen is deemed credible is also open to question because he has apparently testified at a deposition that TriSoIgen itself is an unreasonably dangerous product (see Pease v American Cyanamid Co., 795 F Supp 755, 760 n 5 [D Md 1992]).

. In reply, Lederle has submitted additional portions of Dr. Ritchey’s deposition in which she states that the reason why FDA approval was not sought earlier for the acellular vaccine was because the science was not there. In general, obtaining FDA approval involved convincing it that the low incidence of pertussis disease in the United States would not be jeopardized by the introduction of an alternative vaccine. One thing Lederle had to demonstrate *538 in particular was that the “mouse potency test” that was required by the FDA was an inappropriate test to assess the potency of the acellular vaccine.